Filed 10/23/13  In re A.H. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re A.H., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> A.H., <br><br> Defendant and Appellant. | G048416 <br><br> (Super. Ct. No. DP019203) <br><br> O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Jacki C. Brown, Judge.  Affirmed.

Leslie A. Barry, under appointment by the Court of Appeal, for Defendant and Appellant.

Nicholas S. Chrisos, County Counsel, Karen L. Christensen and Julie J. Agin, Deputy County Counsel, for Plaintiff and Respondent.

A.H. (Mother) appeals from the order made at the Welfare and Institutions Code section 366.26 hearing (hereafter the .26 hearing)[1] terminating her parental rights to her daughter, A.H. She contends there is insufficient evidence to support the adoptability finding. We reject her contentions and affirm the order.

FACTS

In our prior opinion *In re A.H.* (June 28, 2011, G044813 [nonpub. opn.]), we affirmed the juvenile court's order made at the six-month review hearing terminating Mother's reunification services. We adopt and incorporate by reference the facts and analysis from our prior opinion and only briefly summarize them here.

In December 2009, then two-year-old A.H. was taken into protective custody by the Orange County Social Services Agency (SSA) after she fell down stairs and was injured. Mother had left A.H. in the care of paternal relatives three months earlier and made no provision for her medical care. Mother, who lived in Nevada, had already voluntarily relinquished her parental rights to four of her older children. When A.H. came to live with the paternal relatives, she was severely overweight. Mother only sporadically checked in on A.H. and had little bond with the child. (*In re A.H., supra,* typed opn. at pp. 2-3.) Father, who was incarcerated at the time, had never formally established paternity.[2] A.H. was declared a dependent child and ordered removed from parental custody. Mother and Father were given reunification services. (*In re A.H., supra,* typed opn. at pp. 2-3.)

A.H. was eventually placed with a paternal uncle and his wife, and she did well in that placement. With a proper diet, her weight was being brought under control. The paternal grandmother reported Mother, Father, and A.H. had resided with her for the first five months of A.H.'s life during which Mother was largely absent and the paternal

---

[1]     All further statutory references are to the Welfare and Institutions Code.

[2]     Father does not appeal the order terminating parental rights.

2

grandmother and Father were A.H.'s primary caregivers. (*In re A.H., supra,* typed opn. at pp. 3-4.)

Mother failed to cooperate with reunification services and had infrequent contact with A.H. The six-month review hearing was continued several times until January 2011, at which time Mother's services were terminated, but Father was given another six months of services. At the time of the six-month review hearing, A.H. was still in the paternal uncle and aunt's home, and she was thriving there and bonded to them. (*In re A.H., supra,* typed opn. at pp. 10-11.)

*12-Month/18-Month Review Hearing Reporting Period*

A combined 12-month/18-month review hearing was set for June 2011. In its first report, SSA recommended terminating Father's services and setting a .26 hearing. SSA's adoptions division found A.H. would be adoptable. Father was now out of prison and living with Mother in Las Vegas. A.H. was still placed with the paternal uncle and aunt, continued to do well, was well-adjusted to the placement, and was "mastering all age-appropriate developmental tasks." The paternal uncle and aunt indicated they would not be able to adopt A.H., but the paternal grandmother, who lived in Placer County, was interested in placement and adoption. There were reports A.H. had "exhibit[ed] behaviors indicative of anxiety, especially around food. . . . [and] increased tantrums" if not allowed additional snacks or junk food. The behaviors were "more prominent at daycare as opposed to home." She also displayed increased "aggression towards herself" (hitting herself or pulling at her skin) when asked to comply with directions by daycare workers. The court continued Father's services and set a 24-month review hearing on December 1, 2011.

*24-Month Review Hearing Reporting Period*

On June 14, 2011, SSA reported A.H. remained placed with the paternal uncle and aunt. She was doing well and had "somewhat an improvement in her

3

behavior," but still exhibited food-related anxiety—gorging and then throwing tantrums if her request for more food was denied.

In September 2011, SSA reported A.H. was still placed with the paternal uncle and aunt. In early July, her behavior was improving, but by the end of July, problems resurfaced. The caregivers reported in July and August that A.H. sometimes hit her daycare teachers and her aunt, who was pregnant. She sometimes threw tantrums, pulled and scratched at her skin, and displayed food-related anxiety. She was losing weight and her weight was within normal range. A.H. had decreased attention and distractibility. Although a 2010 evaluation at the Regional Center found A.H.'s speech and language were within normal ranges and she did not qualify for services, she was referred to the school district for a developmental evaluation. The paternal uncle and aunt were overwhelmed and did not want to continue caring for A.H. They reported A.H.'s behavior worsened after visits with Father. The social worker observed A.H. was experiencing significant changes during the time her behavior had worsened—her caregiver aunt was pregnant, the uncle and aunt had decided to not adopt her, and Father, recently released from prison, had begun to visit her. "These are additional stressors and contribute to a level of uncertainty for the child and may contribute to the current concerns."

A.H.'s evaluation by the school district took place in October 2011. She was within "normal limits in speech, cognition, and fine and gross motor skills[,]" and she did not qualify for services.

In early November 2011, A.H. was removed from the paternal uncle and aunt's home and placed in an emergency shelter home. The uncle and aunt were overwhelmed by A.H.'s tantrums and complaints being made about inappropriate behavior at daycare such as urinating on another child's blanket. A.H. said she did not want to live with them anymore.

4

After being moved, the foster mother reported A.H.'s behavior was stable, she was a good listener, and she interacted appropriately with a five-year-old child in the foster home. A.H.'s pediatrician examined her in November 2011, and her weight and height were normal. She participated in developmentally appropriate activities and enjoyed visits with her parents.

The foster mother reported A.H. had some difficult episodes. She was generally "okay with food" but sometimes had a "voluntary reflux where she swallows her food, then brings [it] up again to her mouth, and chews it again." A.H. also had incidents where she would be happily playing, but then stop with a blank stare, and then start playing again. A.H. did not mention her family at all, other than the paternal grandmother. The paternal grandmother was being assessed for placement. The social worker continued to note circumstantial stressors and placement changes contributed to A.H.'s behavioral problems.

By the end of November 2011, SSA reported the paternal grandmother continued to be assessed for placement, she and A.H. had a close relationship, and the paternal grandmother was willing to adopt her. The foster mother reported A.H. was "doing great" and although she continued to have tantrums, she was "able to get over them fairly quickly." A.H. continued to be "obsessed with food." The pediatrician found A.H. was allergic to dairy products and when dairy was removed from her diet she did not experience any more "bloating." The foster mother reported A.H. had stopped scratching and pulling at her skin, actions she now suspected were related to an allergic reaction to the dairy products she was served daily at daycare.

In early December 2011, A.H. was placed with the paternal grandmother, who lived in Placer County, and the placement was going well. A.H. occasionally pulled her own hair when upset, but the paternal grandmother was able to stop her from doing so. At the 24-month review hearing on January 9, 2012, the court terminated Father's services and set a .26 hearing for May 7, 2012.

5

*Permanency Planning Reporting Period*

In its April 26, 2012, report for the .26 hearing, SSA reported A.H. was doing well in her placement with the paternal grandmother. Her mental and emotional well-being had greatly improved and her "difficult behaviors" had subsided. She was bonded with the paternal grandmother. A.H. was again found to be obese and was referred for a speech evaluation. She was participating in developmentally appropriate activities and attending preschool. The preschool director described A.H. as a "sweet kid" and "doing awesome," with none of the previously reported behavioral issues. She was very social, participated well, and played cooperatively.

The April 26, 2012, report contained an assessment of A.H.'s adoptability. SSA concluded based on her characteristics and attributes it was likely A.H. would be adopted. Her negative behavior greatly improved. She was a "pretty and healthy four-year-old [who is] bright, verbal, . . . and displays age-appropriate motor skills" and was "within normal limits in speech . . . ." The report contained a favorable preliminary assessment of the paternal grandmother as the prospective adoptive parent. But SSA concluded, even if the paternal grandmother was unable to adopt, based on A.H.'s favorable characteristics, it was likely another adoptive home would be found. The .26 hearing was continued to June 11, 2012.

On June 5, 2012, SSA reported that although A.H. continued to be placed with the paternal grandmother, an issue had arisen impacting the paternal grandmother's ability to adopt. The paternal grandmother had renewed her relationship with the man who was the father of one of her adult children, and they planned on getting married. There was a history of domestic violence between the paternal grandmother and her boyfriend, and he did not pass a background check. The .26 hearing was continued to July 23, 2012.

In its July 20, 2012, report, SSA recommended the court find A.H. adoptable but difficult to place and continue the .26 hearing for 180 days. A.H. was still

living with the paternal grandmother and thriving. SSA continued to assess A.H. as adoptable, but wanted to resolve issues with the paternal grandmother before terminating parental rights.

The .26 hearing was continued to August 23, 2012. SSA reported A.H. continued to thrive in her placement with the paternal grandmother, and no behavioral issues were noted. Pursuant to section 366.26, subdivision (c)(3), the court found A.H. had a probability of adoption but was difficult to place, and continued the.26 hearing for 180 days to February 15, 2013.

In early October 2012, A.H. was removed from the paternal grandmother's home, returned to Orange County, and placed in a foster home. In short, the paternal grandmother failed to comply with instructions regarding her boyfriend's access to A.H. and their living situation. The boyfriend had an extensive criminal arrest history for violent crimes, and both the paternal grandmother and her boyfriend were not forthcoming with information about his background. The paternal grandmother was not approved for adoptive placement. A therapist who had been working with A.H., and the paternal grandmother and her boyfriend, reported A.H. had become "'oppositional" with the paternal grandmother and her boyfriend, but she was not that way with the therapist. The therapist suggested A.H. might have some motor and language delays.

On February 8, 2013, SSA reported A.H. remained in the same foster home where she was healthy and thriving. She exhibited age-appropriate behavior and had grown close to her new foster mother. Her preschool teacher reported she "is doing well and is a pleasure to have in class." A.H. did not display any aggressive or concerning behaviors or preoccupation with food. She understood the current foster home was not a permanent placement for her and was "anxiously awaiting her "'forever' home" and "can't wait to meet her new family." The .26 hearing was continued to March 25, 2013.

On March 20, 2013, SSA reported A.H. remained placed in the same foster home, and continued to thrive, but a prospective adoptive family had been located. The

7

family had an approved adoptive home study and had already adopted a child through SSA. A.H. had already had several successful visits with the prospective adoptive family, including overnights and weekends. There was a "little issue" at bedtime. A.H. did not want to sleep in the bunk bed unless she could sleep in the top bunk, which was not permitted by licensing regulations. The prospective adoptive mother resolved the matter by letting A.H. sleep in a "princess sleeping bag" on the floor. During visits, A.H. and the prospective adoptive family's eight-year-old daughter "got along great and were tied [at] the hip." A.H. was affectionate towards the prospective adoptive mother and said "'I love you" several times. The .26 hearing was continued to May 6, 2013.

In its final report for the .26 hearing filed May 2, 2013, SSA reported now five-year-old A.H. was placed with the prospective adoptive family on March 26. The prospective adoptive mother reported A.H. "ha[d] poor impulse control" sometimes "slam[ing] doors or objects [if] she did not get her way." She was sometimes defiant and cried "so the caregiver [was] constantly redirecting her." When A.H. got mad or upset, she said the paternal grandmother had told her she was a jerk, stupid, and her hair was ugly. When the prospective adoptive mother redirected A.H., she "says she hates everyone and does not want to be there anymore. The foster mother constantly reassures the child she was placed in this home forever and is not going to go anywhere." A.H. would alternate between defiance and clinginess with the prospective adoptive mother. The prospective adoptive mother also observed some sexualized behavior by A.H.—she rubbed lotion in between her legs after a bath and made humping movements saying, "'this is what grandma and grandpa would do.'" A.H. had been referred to therapy to address the concerns.

Nonetheless, SSA reported, "Despite the various behavior concerns, the [prospective adoptive parent] is committed to the adoption of [A.H.] and is taking the necessary action to address [her] behavioral concerns and needs." The prospective adoptive parent requested A.H.'s school conduct "a full psycho[logical] educational

8

evaluation together with appropriate testing for learning disabilities for the child . . . to ensure learning disabilities are ruled out so [A.H.] can start school on the right track." The prospective adoptive mother requested testing of A.H. in all suspected areas of disability, including the areas of auditory processing, executive function, occupational therapy, speech, language, and reading. The prospective adoptive parent had received all the necessary paperwork for the testing but needed to be designated as the educational rights holder for A.H. to proceed.

SSA recommended terminating parental rights and freeing A.H. for adoption. The social worker observed that many of A.H.'s current behavioral problems were associated with changes in placement. A.H. had had five placements during the three and one-half years of the dependency proceeding and her history "of issues with food and oppositional behavior alternating with excessive clinginess" had "essentially vanished" in the recent temporary foster home placement. But A.H. knew that placement was not permanent. The social worker believed A.H.'s "current obsessive behaviors regarding food and her testing behaviors . . . may be her effort to deal with security and attachment issues as she moves to a home that is supposed to be permanent."

*The .26 Hearing/Ruling*

Neither Mother nor Father was present at the .26 hearing, and their counsel did not cross-examine the social workers. Mother's counsel argued the evidence was insufficient to find A.H. was generally adoptable. Additionally, counsel argued that although the adoption assessment contained in the original .26 hearing report dated April 27, 2012, contained a preliminary assessment of the paternal grandmother as the prospective adoptive parent, that placement fell through and there was no assessment of the new prospective adoptive family's eligibility to adopt. Therefore, there was no evidence on which the court could base a finding of specific adoptability either.

The juvenile court terminated parental rights. The court found A.H. was adoptable even if she were not in a prospective adoptive home, stating, "based upon the

9

facts describing [A.H.], she is generally likely to be adopted in that she's attractive, talkative, energetic and can be very affectionate. She's described at times when she is engaged in actions that can be confusing, she tends to be very clingy and emotional with even the people that she's bonded with now, even in the face of having been placed in so many different placements at such a tender age." The court observed A.H. had experienced behavioral problems each time she was put in a new placement, but bonded quickly with the caretakers and became comfortable in her new placement "[a]nd it does appear, particularly in the latest placement that an experienced foster parent who has progressed to a stable adoption rapport, that she will repeat that very pattern again."

DISCUSSION

Mother challenges the juvenile court's finding A.H. was likely to be adopted. She contends the adoption assessment provided by SSA was inadequate and does not provide substantial evidence A.H. is adoptable. We reject her contentions.

"The juvenile court may terminate parental rights only if it determines by clear and convincing evidence that it is likely the child will be adopted within a reasonable time." (*In re Carl R.* (2005) 128 Cal.App.4th 1051, 1060 (*Carl R.*).) "The question of adoptability posed at a section 366.26 hearing usually focuses on whether the child's age, physical condition, and emotional state make it difficult to find a person willing to adopt that child." (*Id.* at p. 1061.) "[I]t is not necessary that the minor already be in a potential adoptive home or that there be a proposed adoptive parent 'waiting in the wings.'" (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649 (*Sarah M.*).) Indeed, under section 366.26, subdivision (c)(1), "[t]he fact that the child is not yet placed in a preadoptive home nor with a relative or foster family who is prepared to adopt the child, shall not constitute a basis for the court to conclude that it is not likely the child will be adopted."

"Review of a determination of adoptability is limited to whether those findings are supported by substantial evidence." (*Carl R.*, *supra*, 128 Cal.App.4th at

10

p. 1061.)  "In reviewing the juvenile court's order, we determine whether the record contains substantial evidence from which a reasonable trier of fact could find clear and convincing evidence that [the child] was likely to be adopted within a reasonable time." (*In re Erik P.* (2002) 104 Cal.App.4th 395, 400.)  "If, on the entire record, there is substantial evidence to support the findings of the juvenile court, we must uphold those findings.  We do not pass on the credibility of witnesses, attempt to resolve conflicts in the evidence or weigh the evidence."  (*In re R.C.* (2008) 169 Cal.App.4th 486, 491.)  "On review of the sufficiency of the evidence, we presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order."  (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.)  The appellant bears the burden of demonstrating "there is no evidence of a sufficiently substantial character to support the verdict."  (*In re Geoffrey G.* (1979) 98 Cal.App.3d 412, 420.)

We reject Mother's contention claimed deficiencies in the adoption assessment require reversal.  "When the juvenile court refers a case to a section 366.26 hearing, it is required to direct the [a]gency to prepare an assessment report of the child as part of its report to the court.  [Citations.]  The assessment report must address the child's medical, developmental, scholastic, mental and emotional status; analyze the likelihood the child will be adopted if parental rights are terminated; describe the efforts made to identify a prospective adoptive parent or legal guardian for the child; and provide a preliminary assessment of the eligibility and commitment of any identified prospective adoptive parent or legal guardian.  [Citations.]  'The assessment report is "a cornerstone of the evidentiary structure" upon which the court, the parents and the child are entitled to rely.'  [Citations.]"  (*In re Michael G.* (2012) 203 Cal.App.4th 580, 590.)

Mother concedes the adoption assessment contained in the April 26, 2012, report fully complied with the statutory requirements of an adoption assessment and "[i]f the juvenile court had found [A.H.] adoptable and ordered parental rights terminated at

11

that time, there would be no issue." But she argues that by the time the .26 hearing finally took place a year later, A.H. had been moved and the paternal grandmother was no longer the prospective adoptive parent. A.H. had been placed with a newly identified prospective adoptive parent, and therefore, Mother argues SSA should have prepared a new adoption assessment. Absent an update, the adoption assessment lacked critical information about the prospective adoptive parent's eligibility and commitment to adopt, or A.H.'s relationship with the prospective adoptive parent.

But any claim of deficiencies in the adoption assessment must be viewed in light of the entire record. "[E]ven if the assessment is incomplete in some respects, the court will look to the totality of the evidence; deficiencies will go to the weight of the evidence and may ultimately prove insignificant. [Citation.] Substantial compliance with the assessment provisions has been deemed enough. [Citation.]" (*In re John F.* (1994) 27 Cal.App.4th 1365, 1378.)

Mother primarily complains that absent a new adoption assessment, there was no preliminary assessment of the new prospective adoptive parent's eligibility to adopt. But the subsequent reports for the .26 hearing explained the prospective adoptive parent already had an approved adoptive home study and had already adopted another child through SSA—an adequate preliminary assessment given that both achievements demonstrated the prospective adoptive parent was eligible to adopt. (See *In re L.Y.L.* (2002) 101 Cal.App.4th 942, 956 [noting licensed foster parents had already been screened for factors required in adoption assessment report]; *In re Diana G.* (1992) 10 Cal.App.4th 1468, 1481-1482 (*Diana G.*) [any potential inadequacy in adoptability assessment of prospective adoptive families was harmless where all families were licensed foster families who were required by statute to submit, inter alia, evidence of reputable and responsible character, criminal record clearance, employment history, and ability to meet child's needs].) The .26 hearing is "merely the preliminary step to adoption," and the prospective adoptive parent will undergo further evaluation before any

adoption can be approved. (*Diana G.*, *supra*, 10 Cal.App.4th at pp. 1481-1482; see also *In re Marina S.* (2005) 132 Cal.App.4th 158, 166 ["'question of a family's suitability to adopt is an issue which is reserved for the subsequent adoption proceeding'"].)

Mother also complains that absent an updated adoption assessment, there was no assessment of the character of the relationship or degree of attachment between A.H. and the prospective adoptive parent, or about the prospective adoptive parent's commitment to adoption. (§ 366.25, subd. (b)(1)(E).) But again that information was contained in the addendum reports for the .26 hearing. The social worker explained the pre-placement visits went well and A.H. quickly bonded with the prospective adoptive parent and her eight-year-old daughter. Once placed in the prospective adoptive parent's home, A.H. did have behavioral issues, but the prospective adoptive parent "constantly reassure[d A.H.] she was placed in this home forever and is not going to go anywhere[,]" she remained "committed to the adoption of [A.H.] and [was] taking the necessary action to address [her] behavioral concerns and needs[,]" and was even seeking immediate educational rights for A.H. so she could have her fully assessed for learning disabilities to ensure A.H. could "start school on the right track."

More importantly, Mother incorrectly assumes A.H. was considered adoptable only because of a prospective adoptive parent's commitment to adopt. In this regard, she ignores SSA's repeated assessment that even if the prospective adoptive parent was unable to adopt, based on A.H.'s many favorable characteristics, it was likely another adoptive home would be found. The trial court specifically found A.H. was *generally* adoptable, and there is no evidence its adoptability finding was based the existence of a specifically identified adoptive parent. In this regard, this case is easily distinguished from *In re Valerie W.* (2008) 162 Cal.App.4th 1, a case on which Mother heavily relies. In that case, minors were found adoptable solely because the prospective adoptive parents wanted to adopt them and the appellate court found the deficiencies in

13

the adoption assessment report sufficiently egregious so as to undermine the adoptability finding. (*Id.* at pp. 13-14.)

As already noted, for a child who is generally adoptable, neither a child's placement in a potential adoptive home nor the availability of prospective adoptive parents "waiting in the wings" is a prerequisite to finding adoptability. (*Sarah M.*, *supra*, 22 Cal.App.4th at p. 1649.) All that is required is clear and convincing evidence of the likelihood the child will be adopted within a reasonable time. (*In re Jennilee T.* (1992) 3 Cal.App.4th 212, 223-225.) Substantial evidence supports the juvenile court's finding A.H. was adoptable. The initial adoption assessment was the negative behavior that marked the waning days of A.H.'s placement with her paternal uncle and aunt greatly improved once she was placed with the paternal grandmother. She was a "pretty and healthy four-year-old [who is] bright, verbal, . . . and displays age-appropriate motor skills" and was "within normal limits in speech." After being removed from the paternal grandmother's home and placed in foster care in Orange County, she quickly adjusted and bonded with the foster mother, exhibited age-appropriate behavior, was doing well in preschool, and was "a pleasure to have in class," and she did not display any aggressive or concerning behaviors or preoccupation with food.

Mother argues A.H.'s negative behavior resurfaced when A.H. was moved to the prospective adoptive parent's home, and she exhibited some sexualized behavior, casting doubt on her adoptability. But the juvenile court specifically found otherwise, and we will not disturb its finding. Overall, A.H.'s behavioral issues had improved, although she had tantrums and "ha[d] poor impulse control" when she did not get her way. SSA reported, "Despite the various behavior concerns, the [prospective adoptive mother] is committed to the adoption of [A.H.] and is taking the necessary action to address [her] behavioral concerns and needs." The social worker noted, as did the juvenile court, A.H.'s behavioral problems were temporary. The social worker opined A.H.'s negative behavior upon moving to the prospective adoptive parent's home, "may

14

be her effort to deal with security and attachment issues" following her long period of dependency and numerous placement changes. The juvenile court specifically observed A.H. had problematic behavior in the past when she was moved to a new placement, but she subsequently bonded with her caretakers and the negative behaviors had subsided—that pattern was evidence her behavior problems would again resolve. A.H. had a demonstrated ability to form attachments to her caretakers, including the prospective adoptive parent and her eight-year-old daughter. Moreover, the prospective adoptive parent was well aware of A.H.'s behavior but wanted to adopt, further indicating her behavior was not an impediment to adoption. (See *In re A.A.* (2008) 167 Cal.App.4th 1292, 1312 ["a prospective adoptive parent's willingness to adopt generally indicates the child is likely to be adopted within a reasonable time either by the prospective adoptive parent or by some other family"].)

Mother argues A.H.'s behavior resulted in her failed placement with the paternal uncle and aunt. But like the proverbial chicken and egg, the record suggests anxiety over the lack of permanency in that placement could have been exacerbating A.H.'s behavior. As SSA reported, when A.H.'s problematic behavior emerged she was subjected to several stressors, including that her Father had just been released from prison and she was beginning visits with him, the aunt was pregnant, and the paternal uncle and aunt had decided they did not want to adopt A.H.

Mother also attempts to recast the severity of the behavioral problems that resurfaced when A.H. was placed with the prospective adoptive parent by suggesting they had become so severe the prospective adoptive parent was driven to request a "full psycho[logical] educational evaluation . . . ." But in context, that request was addressed to A.H.'s school "to ensure learning disabilities are ruled out so the child can start school on the right track." The prospective adoptive parent's concerns about possible learning disabilities, particularly in view of the various assessments that had earlier ruled them out, do not undermine the juvenile court's finding A.H. is generally

15

adoptable.  In short, substantial evidence supports the juvenile court's finding A.H. was adoptable, and therefore, the order terminating parental rights must be affirmed.

DISPOSITION

The order is affirmed.

_____
O'LEARY, ACTING P. J.

WE CONCUR:


_____
MOORE, J.


_____
FYBEL, J.